# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCHOTTENFELD QUALIFIED ASSOCIATES LP, on behalf of itself and all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>WORKSTREAM, INC., MICHAEL MULLARKEY, and DAVID POLANSKY,<br><br>          Defendants. | CASE No. 05-CV-7092 (CLB)<br><br>***Document Electronically Filed*** |

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR FINAL APPROVAL OF SETTLEMENTT

**Table of Contents**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    THE COURT SHOULD APPROVE THE SETTLEMENT AS FAIR,
      REASONABLE AND ADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    The Standard Dictated By The Second Circuit For Assessing The
            Fairness And Adequacy Of Class Action Settlements . . . . . . . . . . . . . . . 4

      B.    When Applying the Second Circuit's Nine Substantive Factors,
            The Settlement Is Fair, Reasonable And Adequate . . . . . . . . . . . . . . . . . . 5

            1.    Continued Litigation Would Have Been Complex, Expensive
                  And Lengthy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    The Class' Positive Reaction to the Settlement Weighs
                  In Favor Of Its Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            3.    The Stage To Which This Litigation Has Proceeded And The
                  Amount Of Discovery Completed Weigh In Favor Of
                  Approving The Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            4.    In Light Of The Risks Of Establishing Liability And Damages,
                  In The Face Of Diminishing Insurance Proceeds, The
                  Settlement Is Fair And Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            5.    The Risks Of Maintaining The Class Action Through Trial
                  Support Approval Of The Settlement . . . . . . . . . . . . . . . . . . . . . . . . 13

            6.    The Range Of Reasonableness Of The Settlement In Light Of
                  The Best Possible Recovery And The Relationship Of The
                  Settlement To A Possible Recovery In Light Of All The Attendant
                  Risks Of Litigation Weigh In Favor Of The Settlement . . . . . . . . . . . . 13

      C.    The Extended And Complicated Negotiations That Led To The
            Settlement Further Evidence Its Adequacy . . . . . . . . . . . . . . . . . . . . . . . 15

II.   THE COURT SHOULD APPROVE THE PROPOSED PLAN OF
      ALLOCATION AS FAIR AND REASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  THE COURT SHOULD AWARD CLASS COUNSEL'S FEE BASED

ON A PERCENTAGE OF THE SETTLEMENT FUND . . . . . . . . . . . . . . . . . . . . . . . 17

A.     The 25% Fee Request Is Appropriate Given The Risks And Results
Of This Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1.     The Significant Time And Labor Counsel Expended To Produce
An Excellent Settlement Supports The 25% Fee Plaintiffs
Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.     The Magnitude And Complexity Of This Litigation Support The
Award Of The 25 % Fee Requested By Plaintiffs . . . . . . . . . . . . . . . . 20

3.     The Substantial Risks Presented By This Litigation Fully
Support The 25% Fee Plaintiffs Request . . . . . . . . . . . . . . . . . . . . . . . 21

4.     The Quality Of The Class Counsel's Representation Of The
Class Supports The 25% Fee Plaintiffs Request . . . . . . . . . . . . . . . . . 24

5.     The Fee Request Is Fair In Relation To The Settlement Amount . . . . . 26

6.     The Public Policy Considerations Fully Support the 25% Fee
Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B.     A Lodestar Cross-Check Confirms The Reasonableness Of The Fee Request . 29

1.     Class Counsel Have Worked a Reasonable Number Of Hours
In Connection with this Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.     Class Counsel's Billing Rates Are Reasonable . . . . . . . . . . . . . . . . . . 29

3.     The Multiplier Implied by Plaintiffs' Fee Request Is Also
Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.    CLASS COUNSEL ARE ENTITLED TO THE REIMBURSEMENT OF
THE EXPENSES THEY ADVANCED ON THE CLASS'S BEHALF . . . . . . . . . . . 32

V.     PLAINTIFFS SHOULD BE GRANTED AN INCENTIVE AWARD . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Lead Plaintiff and Class Representative, Schottenfeld Qualified Associates LP ("SQA"), and Class Representative Robert Barany ("Barany"), on behalf of the Class and by and through Co-Lead Counsel for the Class ("Class Counsel"), respectfully submit this memorandum of law in support of their motion for approval of the settlement (the "Settlement") reached in this class action (the "Action") with defendants Workstream Inc. ("Workstream" or the "Company"), Michael Mullarkey and David Polansky (the "Individual Defendants," and collectively, the "Defendants").  The facts relevant to this motion are set forth in the Joint Declaration of Ralph M. Stone and Ronen Sarraf (the "Joint Decl.") and, for the sake of brevity, are not repeated here.

## PRELIMINARY STATEMENT

The Settlement of this class action, and the terms contained in the parties' Stipulation and Agreement of Settlement, warrants final approval for the following reasons.

The Court should approve the Settlement as fair, reasonable and adequate.  The nine factors used in determining whether the settlement of a class action should be approved have been met.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005).

**First,** the Action, like most securities fraud class actions, is undeniably complex and has already consumed nearly three years of contentious litigation.  *See infra* at 5; s*ee also* Joint Decl. at ¶¶ 34-38.

**Second,** the Class has overwhelmingly approved the Settlement inasmuch as there are no requests for exclusion and only one objection.  *See infra* at 6-7; *see also* Joint Decl. at ¶¶ 39-47.

**Third,** the Action is mature and significant discovery has taken place, including the depositions of the Defendants and other officers of the Company, thus providing counsel with an adequate basis to reach a settlement.  *See infra* at 8; *see also* Joint Decl. at ¶¶ 48-51.

**Fourth,** the risks of establishing liability are high, particularly given that Plaintiffs must demonstrate that defendants acted with a particular state of mind. *See infra* at 9-12; s*ee also* Joint Decl. at ¶¶ 52-59.

**Fifth,** the risks of establishing damages are high since it will require expert testimony and, most likely, significant legal challenges thereto. *See infra* at 9-12; *see also* Joint Decl. at ¶¶ 60-68.

**Sixth**, while the risk of maintaining the class action through trial is relatively low, the issue would remain in play through trial and appeals, and thus some risk remained that a class recovery would be impeded. *See infra* at 12-13; *see also* Joint Decl. at ¶ 73-74.

**Seventh**, Defendants did not have a meaningful ability to withstand a greater judgment insofar as the Company is financially strapped, and the two individual defendants would likely be judgment proof beyond the existence of two modest insurance policies being wasted on this and other litigation. *See infra* at 13-14; *see also* Joint Decl. at ¶¶ 69-72.

**Eighth** and **Ninth**, this Settlement is well within the range of reasonableness in light of the fact that despite significant risks to obtaining anything at all, the Settlement represents nearly half of the available insurance proceeds, which itself likely represented the entire universe of funds available to satisfy any judgment. *See infra* at 13-14; *see also* Joint Decl. at ¶ 76-77.

**Lastly,** the process by which this Settlement was achieved – numerous telephonic and in-person meetings, in addition to two separate mediations presided over by professional mediators (one of which was before retired justice E. Leo Milonas) – lends significant support to its fairness. *See infra* at 14-15; s*ee also* Joint Decl. at ¶¶ 18-19.

The Court should approve the Plan of Allocation (which Class Counsel prepared) because it distributes the settlement fund based on each Class member's individual losses, does not

require substantial additional discovery or expert fees, and is similar in structure to many other plans that have been approved and implemented in securities class action settlements.

Finally, the Court should approve Plaintiffs' request for attorneys' fees, reimbursement of expenses and service fee awards. Class Counsel's fee request of 25% of the Settlement fund – a figure which Lead Plaintiff SQA negotiated with Class Counsel prior to the commencement of this Action – is undeniably fair. Attorney's fees representing a quarter of a settlement fund are well within the range of fees that courts have approved and, in light of Class Counsel's efforts on this case, represents a very low 0.908 multiplier on Class Counsel's time, thus further supporting its reasonableness. Moreover, Class Counsel is entitled to a reimbursement of their out of pocket expenses of $38,882.48, which in light of the duration, complexity and risk of this Action is reasonable. Finally, SQA and Barany are entitled to service awards for their efforts on behalf of the Class. Indeed, but for SQA this Action would not have been brought. Moreover, SQA was integral to the formulation of the case strategy, sat for a deposition, and produced thousands of pages of documents (rivaling the volume of defendants' own production). Mr. Barany, who served as Class Representative alongside SQA, also produced documents, sat for a deposition and actively participated in the prosecution of this Action. Their requests for service awards are within the range awarded to plaintiffs and well-deserved in light of their efforts and the excellent recovery obtained here.

For all these reasons, final approval of this Settlement is warranted.

**ARGUMENT**

I.    **THE COURT SHOULD APPROVE THE SETTLEMENT
      AS FAIR, REASONABLE AND ADEQUATE**

    A.    **The Standard Dictated By The Second Circuit For Assessing
            The Fairness And Adequacy Of Class Action Settlements**

Federal courts have long expressed a preference for the negotiated resolution of litigation,[1] a preference especially strong with respect to class actions because of their demand on party and judicial resources.[2]  This judicial preference notwithstanding, the District Court must still assess the fairness of any class action settlement and should only "approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.'"  *Wal-Mart*, 396 F.3d at 116 (citation omitted).

Consistent with those general principles, courts assess the fairness and adequacy of proposed class action settlements by considering both their substance and the process that preceded the parties' compromise.[3]  With respect to the former, the Second Circuit has outlined nine non-inclusive factors that may be considered by District Courts:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the

---

[1] *See, e.g.*, *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts").

[2] *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) ("Indeed, there is a 'general policy favoring the settlement of litigation.'…This is particularly true of class actions.") (*quoting Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)).

[3] *See Taft*, 2007 WL 414493, at *4 ("In determining fairness of a settlement, courts evaluate both (1) the negotiation process and (2) the substantive terms of settlement.").

4

range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974) (paragraph breaks omitted)); *see also County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990). In weighing these factors, courts have recognized that settlements typically involve significant "give and take" between negotiating parties. As a result, judges reviewing class action settlements should neither attempt to rewrite settlement agreements nor endeavor to resolve issues left undecided as a result of the parties' compromise.[4]

**B.    When Applying The Second Circuit's Nine Substantive Factors, The Settlement Is Fair, Reasonable And Adequate**

**1.    Continued Litigation Would Have Been Complex, Expensive And Lengthy**

The first factor articulated by the Second Circuit for assessing the adequacy of class action settlements is "the complexity, expense and likely duration of the litigation." *Wal-Mart*, 396 F.3d at 117; *Long Island Lighting*, 907 F.2d at 1323. This Action has already required nearly three years of complex litigation requiring Class Counsel to devote substantial time and money to litigate the claims. Class Counsel has prepared two exhaustively researched amended complaints, undertook substantial discovery across the country and Canada, successfully certified the Class in the face of fierce opposition, and participated in numerous settlement

---

[4] *See, e.g., In re Warner Comms. Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986) ("[I]t is not a district judge's job to dictate the terms of a class settlement."); *Grinnell*, 495 F.2d at 462 ("It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement. . . . Such procedure would emasculate the very purpose for which settlements are made."); *In re Sterling Foster & Co., Inc., Sec. Litig.,* 2006 WL 3193744, at *4 (S.D.N.Y. Oct. 31, 2006) ("'[i]n analyzing the parties' risks of establishing liability, the Court does not [need to] decide the merits of the case or resolve unsettled legal questions'") (quoting *Cinelli v. MCS Claim Servs. Inc.,* 236 F.R.D. 118, 121 (E.D.N.Y. 2006)).

discussions including two mediations. Despite these efforts, continued litigation would have been long and expensive. Plaintiffs would have had to still defeat Defendants' motion for judgment on the pleadings and thereafter establish liability and damages at a trial, which would have included expert testimony regarding intricate accounting rules and damage calculations. Joint Decl. at ¶¶ 53-68.

Moreover, as discussed at greater length *infra*, the funds Defendants would be using to continue to litigate this case are the proceeds of certain insurance liability policies. Continued litigation would have reduced, if not exhausted, those policies. Joint Decl. at ¶ 37. The Settlement therefore represents the best alternative for securing substantial relief for the Class. Plaintiffs believe that continued litigation would likely produce a substantial verdict for the Class, but only after Plaintiffs and the Court expended enormous resources. Joint Decl. at ¶¶ 34-38. Thus, the first prong of the Second Circuit's test for weighing proposed class action settlements – "the complexity, expense and likely duration of the litigation" – supports approving the Settlement.

### 2. The Class' Positive Reaction To The Settlement Weighs In Favor Of Its Approval

The second factor for determining whether class action settlements should be approved – "the reaction of the class to the settlement" – also supports approving the Settlement. *Wal-Mart*, 396 F.3d at 117. Pursuant to the Court's Preliminary Order, the Claims Administrator mailed approximately 5,563 Notices and Proof of Claim forms to Class members (including 118 Notice and Proof of Claim forms that were sent to updated addresses). *See* Joint Decl. ¶¶ 39. The Notice contains a detailed description of: the nature and procedural history of this Action; Plaintiffs' claims; the amount of the Settlement; the plan of allocation to Class members; the claims that will be released in connection with the Settlement; Plaintiffs' application for an

award of attorneys' fees and expenses; the deadline and procedures for filing objections to the Settlement and the application for the payment of counsel fees; and, the deadline and procedures for opting out of the Class.  Thus, the Notice was more than sufficient to alert dissenting Class members of their rights to object to any provision of the Settlement or to opt out.  *See, e.g.*, *In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993).

Opt-outs and objections were due by May 27, 2008, and only a single Class member has objected to the Settlement; no request to opt out was filed.  *See* Joint Decl. at ¶ 40.  The sole objection, from Matthew Fischer (attached as Exhibit F to the Joint Decl.), raises four objections to the settlement:

(1) that "if the allegations are true" the settlement amount is inadequate;

(2) that "in general, the only beneficiary in these types of lawsuits is the law firms involved and their lead plaintiffs" and that there is insufficient basis to conclude why the lead plaintiffs are seeking an incentive award;

(3) that a portion of the settlement is in the form of Workstream stock and it will thus cost money to sell the stock; and,

(4) that an objection to the settlement needs to be mailed to five different addresses.

Mr. Fischer's objections are without merit, and should, therefore, be rejected by the Court.  First, Defendants strongly opposed the truth of any of Plaintiffs' allegations, and only after a lengthy trial and likely appeals would the truth of Plaintiffs' allegations ever be determined.  Second, as detailed herein, Plaintiffs and their counsel have spent hundreds of hours investigating, prosecuting and settling these claims at great expense and with no expectation of recovery, thus justifying their request for incentive payments, fees and expenses.  Plaintiffs and Class Counsel have submitted declarations attesting to the efforts spent on this litigation and the

justifications for their request for fees and incentive payments.  Third, company stock is a well-accepted form of consideration for settlements and is especially appropriate here, given the increasing unavailability of cash.  Fourth, requiring an objector to serve a copy of an objection on the court and all counsel involved is consistent with due process and is not unduly burdensome.  Finally, given that only a single Class member objected to the Settlement, it is clear that the vast majority of the Class clearly supports the Settlement.  Thus, the support of the majority of the Class  weighs heavily in favor of approval.[5]

> **3.  The Stage To Which This Litigation Has Proceeded And The Amount Of Discovery Completed Weigh In Favor Of Approving The Settlement**

The third factor identified by the Second Circuit for assessing the fairness and adequacy of class action settlements is "the stage of the proceedings and the amount of discovery completed." *Wal-Mart*, 396 F.3d at 117; *Long Island Lighting*, 907 F.2d at 1323.  This factor turns upon whether plaintiffs possess sufficient information regarding the merits of their claims to make an educated assessment regarding a litigation's likely outcome.  Here, as outlined in the Joint Declaration, Plaintiffs' knowledge base is far more than sufficient to formulate an informed view concerning the merits of the Settlement and likely outcome of this litigation.  *See* Joint Decl. at ¶¶ 48-77.

Following the Court's resolution of the motion to dismiss, Plaintiffs issued numerous document requests, interrogatories and deposition notices and subpoenas.  Class Counsel

---

[5] *See, e.g., Wal-Mart*, 396 F.3d at 119 ("Indeed, the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our *Grinnell* inquiry."); *Long Island Lighting*, 907 F.2d at 1323 (approving class action settlement despite existence of evidence that majority of class representatives opposed settlement); *Taft*, 2007 WL 414493, at *5 (reaction of class weighed "soundly in favor of the settlement" where "six class members have objected, and 10 requests for exclusion were made"); *Hicks*, 2005 WL 2757792, at *4 (reaction of class to settlement supported its approval where 104 class members opted out and three class members objected).

reviewed thousands of documents, and moved to compel the production of certain documents and interrogatory responses, including a deposition pursuant to Rule 30(b)(6). Class Counsel conducted nine depositions, which took place across the country and Canada, and which involved both party and non-party deponents. Class Counsel were also informed about the Defendants' insurance policies and the pace at which those policies were being exhausted. Accordingly, "the stage of the proceedings and the amount of discovery completed" support the approval of the Settlement. Indeed, courts have approved settlements in circumstances where plaintiffs possessed far less information concerning their claims than Plaintiffs accessed here.[6]

**4.      In Light Of The Risks Of Establishing Liability And Damages,
In The Face Of Diminishing Insurance Proceeds,
The Settlement Is Fair And Reasonable**

Perhaps the most important factors in any assessment of the merits of the Settlement are the "the risks of establishing liability," "the risks of establishing damages," and "the ability of the defendants to withstand a greater judgment" – the fourth, fifth and seventh factors utilized in the Second Circuit for analyzing the adequacy of class action settlements.[7] In this case, the Company was financially strapped, the Individual Defendants could be expected to be judgment proof, and the only meaningful source of funding for any judgment were two modest insurance

---

[6] *See, e.g., Taft*, 2007 WL 414493, at *6 (although case was settled before plaintiffs conducted any formal discovery, confirmatory document review and witness interviews provided the plaintiffs with a sufficient factual foundation to assess the merits of their settlement because "the Court's inquiry is into whether the plaintiffs have sufficient information to evaluate the adequacy of the proposed settlement, not whether they have availed themselves of all possible information"); *American Bank Note*, 127 F. Supp. 2d at 426 (Class Counsel had a sufficient basis to assess the strengths and weaknesses of the plaintiffs' claims although they had taken no depositions and "formal discovery was not very far along").

[7] *Wal-Mart*, 396 F.3d at 117; *Long Island Lighting*, 907 F.2d at 1323-24; *Blech*, 2000 WL 661680, at *3 ("The Court's primary concern is with 'the substantive terms of the settlement compared to the likely result of a trial . . . .'") (quoting *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir. 1983)).

policies, the proceeds of which were being spent on defense costs relating to at least two securities cases.  In light of these realities, additional litigation was likely to produce nothing more than a paper judgment against insolvent defendants determined to protect whatever assets they owned from the Class.  Under these circumstances, Settlement is indisputably the preferable alternative.[8]

In addition to the collection of any judgment, Plaintiffs also recognized the numerous obstacles that existed before a judgment could be obtained.  Even in the best of cases, establishing that Defendants acted with scienter, *i.e.,* a culpable state of mind, is no easy task.[9] Here, this substantial obstacle to Plaintiffs' success at trial was enhanced because the Individual Defendants did not sell any Workstream stock during the Class Period.  Thus, the Individual Defendants were certain to argue to a jury – as they did in connection with their motion to dismiss – that they had no motive to inflate Workstream's financials.

Additionally, Plaintiffs recognized that shaping the thousands of pages of documents and the testimony of numerous witnesses into a persuasive presentation that the Individual Defendants acted with scienter was no simple undertaking.  Recently, in a case involving a high

---

[8]  *See, e.g.*, *Long Island Lighting*, 907 F.2d at 1324-25 (risk that a higher award would bankrupt the defendant militated in favor of approving the settlement); *Taft*, 2007 WL 414493, at *6 (where plaintiffs asserted claim against a viable, albeit financially troubled, corporate entity, ability of defendants to withstand a greater judgment weighed in favor of settlement because, "[a]lthough the defendants may be able to withstand a greater judgment, it is not certain that they could withstand a significantly greater one"); *Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) (approving settlement where insurance "would be significantly depleted by defense costs").

[9] *See, e.g., American Bank Note*, 127 F. Supp. 2d at 426 (recognizing substantial risks in proving scienter); *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 115 (S.D.N.Y. 1999) (recognizing that securities fraud "plaintiff[s]…face the difficult task of proving that defendants acted with scienter – that they acted with knowledge or reckless disregard of the truth of the alleged misrepresentations"); *Adair v. Bristol Tech. Sys.*, Inc., 1999 WL 1037878, at *2 (S.D.N.Y. Nov. 16, 1999) ("Plaintiffs would have to prove that Defendants acted with scienter, *a difficult burden to meet…*") (emphasis added).

profile alleged fraud involving JDS Uniphase, a technology high-flyer, the jury determined that senior executives who were pilloried in the press for alleged fraudulent conduct and who had sold hundreds of millions of dollars of their stock in the weeks prior to the collapse of the stock, did not act with scienter. Those results highlight the difficulty of holding juries' attention long enough to present complex fraud cases in a persuasive manner and of establishing scienter in even the most compelling factual circumstances. These scienter-related factors therefore also militate in favor of approving the Settlement.

The fact that Plaintiffs would have to introduce much of their case through expert testimony also enhanced the risk that they would not succeed in proving their claims against the Individual Defendants. In recent years, the class action defense bar has devoted enormous effort to perfecting *Daubert* attacks upon the admissibility of the testimony of plaintiffs' experts concerning matters such as loss causation and damages. *See Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579 (1993). In a number of cases, those attacks have succeeded.[10] Obviously, had Plaintiffs' accounting, damages or loss causation experts been struck on *Daubert* grounds, it would have been a devastating blow to the Class. As a result, the costly challenges to Plaintiffs' experts that Class Counsel expected the Individual Defendants to mount also support the conclusion that the Settlement represents an attractive result for the Class.

---

[10] *See, e.g., In re Worldcom, Inc., Sec. Litig.*, 2005 WL 375314, at *12 (S.D.N.Y. Feb. 17, 2005) (granting motion to exclude testimony of plaintiffs' due diligence expert on *Daubert* grounds); *Kaufman v. Motorola, Inc.*, 2000 WL 1506892, at *1-2 (N.D. Ill. Sept. 21, 2000) (precluding plaintiffs' damages expert from testifying in securities class action on *Daubert* grounds); *In re Aetna Inc. Sec. Litig.*, 2001 WL 20928, at *10 (E.D. Pa. Jan. 4, 2001) (among factors supporting adequacy of settlement was that the "[p]laintiffs' damages theories rested primarily on the testimony and reports of expert witnesses" and "[s]uch experts would likely have been challenged on *Daubert* or other grounds"); Robert Alessi, "The Emerging Judicial Hostility to the Typical Damages Model Employed By Plaintiffs in Securities Class Action Lawsuits," *Business Lawyer* (Feb. 2001).

Ultimately, therefore, Plaintiffs and their counsel recognized that Plaintiffs faced substantial risks of a diminished or nonexistent recovery had they not settled their claims. But for the Settlement, each of the legal issues discussed above would have been hotly contested on summary judgment and at trial. Although Plaintiffs believe the Class would have succeeded at trial, the Defendants could have prevailed on any of the foregoing disputed issues, leaving the Class with no recovery at all. In sum, the Settlement is the best compromise attainable for the Class in light of the risks Plaintiffs faced with respect to their ultimate ability to collect damages that equaled, much less exceeded, those provided by the Settlement.[11] Accordingly, "the risks of establishing liability," "the risks of establishing damages," and "the ability of the defendants to withstand a greater judgment" support approving the Settlement as fair and reasonable to Class members.[12]

_____

[11] *See, e.g., American Bank Note*, 127 F. Supp. 2d at 424-25 (recognizing that there were substantial risks to recovery in a securities class action although there were criminal investigations pending and individual defendants either had or were likely to assert their Fifth Amendment privilege against self-incrimination); *Adair*, 1999 WL 1037878, at *2 (approval of settlement was appropriate where plaintiffs "would have to show a causal connection between the drop in Bristol's stock or warrant price and the purported omissions from the Prospectus, which Defendants would have vigorously disputed with expert testimony"); *Sumitomo*, 189 F.R.D. at 283 (risk of establishing damages in commodities fraud litigation that would require significant expert testimony weighed heavily in favor of approval of proposed settlement); *PaineWebber*, 171 F.R.D. at 128-29 (difficulty of proving damages in class action involving novel issues and uncertain results supported approval of settlement).

[12] The history of shareholder and class action litigation provides numerous examples of cases where courts dismissed even apparently well established claims. In 1994, for example, the Supreme Court's decision in *Central Bank* that aiding and abetting claims were not actionable under § 10(b) – although every Court of Appeals to address the issue had reached a contrary result – resulted in the dismissal of numerous pending cases. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 169 (1994). In addition, plaintiffs in securities class actions have repeatedly lost cases on summary judgment or at trial that were litigated for many years at great expense. *See, e.g., Freedman v. Value Health, Inc.,* 34 Fed. Appx. 408, 409 (2d Cir. May 1, 2002) (affirming district court's grant of summary judgment in favor of defendants); *Robbins*, 116 F.3d at 1449 (verdict of $81 million for plaintiffs in securities class action against an accounting firm reversed on loss causation grounds and judgment entered for defendant); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (affirming grant of

### 5.     The Risks Of Maintaining The Class Action Through Trial Support Approval of the Settlement

The fifth factor outlined by the Second Circuit for assessing the fairness of class action settlements – "the risks of maintaining the class action through the trial" – weighs in favor of the Settlement. *Wal-Mart*, 396 F.3d at 117; *Long Island Lighting*, 907 F.2d at 1324. While courts have long recognized that securities class actions are particularly suitable subjects of class action litigation,[13] Defendants raised numerous challenges to the suitability of the Class Representatives and, in particular, the suitability of the Lead Plaintiff, and could have taken a direct appeal of the Court's decision to certify the Class on those grounds. Moreover, following trial Defendants would have most certainly raised those issues on appeal in an attempt to decertify the Class. The risk of decertification was significant and, therefore, favors approving the Settlement.

### 6.     The Range Of Reasonableness Of The Settlement In Light Of The Best Possible Recovery And The Relationship Of The Settlement To A Possible Recovery In Light Of All The Attendant Risks Of Litigation Weigh In Favor Of The Settlement

Given the Defendants' financial circumstances, there was no realistic possibility that a settlement or trial would produce a recovery larger than the available proceeds from the insurance policies. Indeed, as discussed above, further litigation was likely only to diminish the

---

summary judgment to defendants in securities fraud class action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 509 (9th Cir. 1991) (affirming grant of summary judgment for defendants in securities class action after almost five years of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (after trial, reversing the district court's denial of JNOV motion and remanding with instruction to dismiss the complaint); *Ward v. Succession of Freeman,* 854 F.2d 780 (5th Cir.1988) (reversing plaintiffs' jury verdict for securities fraud); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994) (directed verdict for defendants in securities class action after plaintiffs' presentation of case at trial), *aff'd*, 50 F.3d 6 (4th Cir. 1995); *In re Health Mgmt., Inc. Sec. Litig.*, No. 96-CV-889 (ADS) (E.D.N.Y.) (jury verdict for auditor in securities class action).

[13] *See, e.g., In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993).

Class's recovery by further exhausting the limited insurance proceeds available. In similarly challenging circumstances, the federal courts have noted that even settlements producing small percentage recoveries may constitute admirable results.[14] Preliminary damage analyses put Class damages in a range of between $20 million and $40 million. Joint Decl. at ¶ 8. Given this range, the Settlement represents a recovery of between 10% and 20% of the Class's losses. Given that much of the claim rested on allegations concerning a projection, which Plaintiffs also sought to characterize as an accounting claim, this recovery is an excellent one.

Accordingly, while Plaintiffs recognize that the Class's theoretical potential recovery against the Defendants exceeds the amount of the Settlement, the reality is that Plaintiffs procured a recovery that took nearly half of the available insurance proceeds. Continued litigation presented the specter of prolonged proceedings conducted at great expense, but ultimately producing a Pyrrhic victory against essentially judgment-proof defendants. In light of those incontrovertible facts, the Settlement represents an excellent result given the attendant risks of this litigation despite the obviously greater magnitude of the Class's theoretical maximum recovery.[15]

---

[14] *E.g.*, *Grinnell*, 495 F.2d at 455 n.2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *Weinberger*, 698 F.2d at 65 (Second Circuit upheld a settlement that amounted to "only a negligible percentage of the losses suffered by the class"); *Taft*, 2007 WL 414493, at *7 (rejecting objections that settlement was inadequate because it recovered only a small percentage of class members' losses where the objection ignored the need to prove loss causation and the other significant risks to the plaintiffs' success at trial); *Sterling Foster*, 2006 WL 3193744, at *5 (recovery of "4.8% of the $75 million loss" against financially sound investment bank was reasonable in light of the "considerable risks" that the plaintiffs would not prevail); *Hicks*, 2005 WL 2757792, at *7 (settlement that constituted 3.8% of the plaintiffs' damages estimate in a case brought against a well-funded investment bank was reasonable in light of the risks of continued litigation).

[15] *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004) (approving settlement that represented a very small percentage of class's maximum recovery although the defendants included a CEO who was one of the world's richest men (Gary

C.    The Extended And Complicated Negotiations That Led
To The Settlement Further Evidence Its Adequacy

Courts assessing whether to approve class action settlements also consider whether the

procedure that produced the settlement supports its fairness.    In that regard, courts have

principally focused upon whether the negotiations preceding the settlement were conducted at

arms' length.[16]    When that requirement is satisfied, counsel's endorsement of a proposed

settlement is entitled to significant weight.[17]

The Joint Declaration outlines in detail the complicated and numerous negotiations that

produced the Settlement.    *See* Joint Decl. at ¶¶ 10, 18, 51.    In summary, those negotiations

included numerous telephone calls, in-person meetings, and mediation sessions presided over by

two separate mediators.    The Settlement was only reached after a second closely-worked

mediation before the Honorable E. Leo Milonas, a very highly regarded former justice of the

New York state bench.    These facts demonstrate that the procedure that produced the Settlement

---

Winnick) because "the insurance coverage in this case is limited, rapidly being consumed by
legal fees, and at risk in light of potential competing claims, jurisdictional issues, and the
carrier's uncertain financial and reinsurance situation" and these factors demonstrated that,
"when judged against the realistic, rather than theoretical, potential for recovery after trial, the
settlement amount is extremely beneficial").

[16]  *See Wal-Mart*, 396 F.3d at 116 ("A 'presumption of fairness, adequacy, and reasonableness
may attach to a class settlement reached in arm's-length negotiations between experienced,
capable counsel after meaningful discovery.'") (quoting *Manual for Complex Litigation, Third,* §
30.42 (1995)); *Sterling Foster*, 2006 WL 3193744, at *3 ("A strong presumption of fairness
attaches to proposed settlements that have been negotiated at arms-length."); *In re Indep. Energy
Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that
the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a
private mediator experienced in complex litigation, is further proof that it is fair and
reasonable.").

[17]  *See In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *10 (S.D.N.Y. Nov. 26,
2002); *Sumitomo*, 189 F.R.D. at 280 (when settlement negotiations are conducted at arms'
length, "'great weight' is accorded to the recommendations of counsel, who are most closely
acquainted with the facts of the underlying litigation") (quoting *In re PaineWebber Ltd. P'ships.
Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)).

was, at every stage, adversarial in nature and hotly contentious.  These settlement negotiations, therefore, lend further credence to the conclusion that this compromise is fair to the Class.

Accordingly, the lengthy, complicated and hard-fought process that culminated in the Settlement is a testament to its procedural fairness.[18]  Counsel's determination that the Settlement is fair, reasonable, and adequate therefore also weighs in favor of approving its terms.

## II.    THE COURT SHOULD APPROVE THE PROPOSED PLAN OF ALLOCATION AS FAIR AND REASONABLE

The Plan of Allocation (the "Plan") – the methodology for dividing the proceeds of the settlement among Class members – is outlined in detail in the Class Notice, Proof of Claim and Joint Declaration.  *See* Joint Decl. at ¶¶ 20-26.  In general, the Plan calls for Class members to share on a *pro rata* basis in the recovery provided by the Settlement based upon the difference between the total amount of their Class Period purchases of Workstream securities and either: (a) the amount for which they sold those securities during the Class Period; or (b) the total value of those shares at the end of the Class Period, if the Class members continued to hold their securities until that time.  *Id.* at ¶¶ 25-26.

Class Counsel believe that the Plan of Allocation represents the fairest methodology for dividing the settlement proceeds among Class members that Plaintiffs could develop without conducting substantial additional discovery and incurring significant additional expert fees. Courts have repeatedly noted that class counsel's determinations regarding plans of allocation

---

[18]  *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[A] court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."); *Taft*, 2007 WL 414493, at *4-5 (procedural fairness of settlement negotiations was established where class counsel was experienced in litigating and settling class actions and settlement was not finalized until nearly a year after negotiations commenced); *Hicks*, 2005 WL 2757792, at *5 (procedural fairness of settlement was supported by "[t]he participation of a respected and neutral mediator" and the fact that negotiations broke down and resulted in a settlement only six months after they were initiated).

are generally entitled to considerable weight.[19]   Moreover, the Plan is similar in structure to many other plans that have been approved and implemented in securities class actions.[20]   As such, like the Settlement as a whole, the Plan should be approved by the Court as fair, reasonable, and equitable.

### III.   THE COURT SHOULD AWARD CLASS COUNSEL'S FEE BASED ON A PERCENTAGE OF THE SETTLEMENT FUND

Pursuant to the "'equitable' or 'common fund' doctrine established more than a century ago in [*Trustees v. Greenough*, 105 U.S. 527, 532-533 (1881)], attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work."   *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001).   Fees and expenses are paid from the common fund so that all class members contribute equally towards the costs of pursuing litigation on their behalf.   *See Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir. 2000).

The Second Circuit has authorized two fee calculation methods.   Under the "lodestar" method, the court "multiplies hours reasonably expended against a reasonable hourly rate."   *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005).   Once the lodestar is

---

[19] *Taft*, 2007 WL 414493, at *9 ("If the plan of allocation is formulated by "competent and experienced class counsel, an allocation plan need only have a 'reasonable, rational basis.'") (quoting *Hicks*, 2005 WL 2757792, at *7); *Maley*, 186 F. Supp. 2d at 367 (plan of allocation should be approved as long as it has a "reasonable, rational basis"); *American Bank Note*, 127 F. Supp. 2d at 429-30 ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel.") (citation omitted); *PaineWebber*, 171 F.R.D. at 133 ("As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.").

[20] *See, e.g.*, *In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d 1353, 1362 (9th Cir. 1979); *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *Sterling Foster*, 2006 WL 3193744, at *5 ("'Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach.'") (quoting *Global Crossing*, 225 F.R.D. at 462); *see also* 3B *Moore's Federal Practice* ¶ 23.80(4), at 23-51, 519 (1978).

calculated, "[c]ourts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys." *Id.*

The second method for calculating fees is the "percentage of the fund method." *Id.* As the *Wal-Mart* court explained, this method"[t]'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of Litigation…'" *Id.* (quoting *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002)).[21]

District Courts in this Circuit have long preferred the percentage methodology over the lodestar approach.[22] That preference is consistent with national precedent.[23] Moreover, the percentage approach is consistent with the federal securities laws' requirement that attorneys' fees in securities class actions not "'exceed a reasonable *percentage* of the amount of any damages and prejudgment interest actually paid to the class.'" *American Bank Note*, 127 F. Supp. 2d at 430 (*quoting* 15 U.S.C. § 78u-4(a)(6)) (emphasis in original). Nevertheless, courts performing a percentage analysis also commonly undertake a lodestar "cross-check" to ensure

---

[21] In contrast, the lodestar methodology "'create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits.'" *Id.* at 121 (citation omitted).

[22] *See, e.g., American Bank Note,* 127 F. Supp. 2d at 431 ("the trend of the district courts in this Circuit is to use the percentage of the fund approach to calculate attorneys' fees"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999) ("Support for the lodestar/multiplier approach in common fund cases has eroded, and there has been a 'ground swell of support for *mandating* a percentage-of-the-fund approach' in the common fund cases.") (citation omitted) (emphasis in original).

[23] *See, e.g., Maley v. Del Global Techns. Corp.,* 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("[T]here is a strong consensus – both in this Circuit and across the country – in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."); *American Bank Note*, 127 F. Supp. 2d at 430 ("In recent years, a majority of the Circuit courts have approved the percentage-of-the-fund method.").

that the percentage fee awarded to class counsel does not represent a "windfall." *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007); *Wal-Mart*, 396 F.3d at 123.

In accordance with the approach preferred by the Second Circuit and most District Courts in this Circuit, Plaintiffs submit their request for attorneys' fees utilizing the percentage of recovery approach.  Plaintiffs further demonstrate that the lodestar "cross-check" analysis contemplated by the Second Circuit also supports the 25% fee.

### A.    The 25% Fee Request Is Appropriate Given The Risks and Results of this Litigation

Six factors guide a courts' discretion in assessing the appropriate percentage fee to award class counsel: "(1) counsel's time and labor; (2) the litigation's complexities and magnitude; (3) the litigation risks; (4) quality of representation; (5) the relationship of the requested fee to the settlement; and (6) considerations of public policy." *Masters*, 473 F.3d at 436; *accord, e.g.*, *Wal-Mart*, 396 F.3d at 121.  Courts have noted that the overall goal of the fee setting process is to replicate the payment counsel would receive in a perfect market.[24]

Before addressing these factors, however, it is important to note that before being retained in this action, Lead Plaintiff SQA, on behalf of the putative class, negotiated the attorneys' fees that Class Counsel could seek following a successful recovery of funds for the Class.  Class Counsel agreed to seek a fee of no more than 25% of any recovery.  While a larger fee award may be appropriate, Class Counsel is of course abiding by the agreement struck with Lead Plaintiff.  The existence of a negotiated fee with a sophisticated client prior to the commencement of an action acts as a market determinant of a fair fee and counsels strongly in favor of approving the fee request.

---

[24] *Goldberger*, 209 F.3d at 52 ("market rates, where available, are the ideal proxy for their compensation"); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992).

1.      **The Significant Time And Labor Counsel Expended To Produce An Excellent Settlement Supports The 25% Fee Plaintiffs Request**

The first factor for determining an appropriate attorneys' fee is the time and labor expended by counsel.  *See Masters*, 473 F.3d at 436.  In all, Class Counsel have spent 2,310.20 hours litigating this matter.  *Id.* at ¶¶ 78, 80.  Those efforts have run the gamut of steps litigators may undertake, including drafting complaints, significant discovery and motion practice.  *Id.* at ¶¶ 10, 12-15, 77.  In sum, Class Counsel have expended significant time and labor in prosecuting Plaintiffs' claims.  Those concerted efforts were undertaken despite significant risks that Plaintiffs would not prevail, and, therefore,  that Class Counsel would receive nothing for their labor.  The "time and labor expended by counsel" in producing an excellent Settlement under difficult circumstances therefore support the 25% fee Plaintiffs request.[25]

2.      **The Magnitude And Complexity Of This Litigation Support The Award Of The 25% Fee Requested By Plaintiffs**

The second criterion for determining the appropriate fee in class action settlements is the "magnitude and complexities of the litigation."  *Wal-Mart*, 396 F.3d at 121; *see also, e.g., Masters*, 473 F.3d at 436.  The Joint Declaration's discussion of those issues amply demonstrates that this case was both large and complex, *see* Joint Decl. at ¶¶ 33-38, and there can be no question that this litigation was significant.  Indeed, the Action involved questions of GAAP and the propriety of how a software company accounts for its revenues.  These complexities were further enhanced by the difficulty Plaintiffs would face proving their claims at trial.  This factor supports the 25% fee Plaintiffs request for their counsel.

---

[25] *See, e.g., Sumitomo*, 74 F. Supp. 2d at 399 (27.5% fee award was justified in action involving settlement in excess of $115 million because Class Counsel "were required to expend substantial amounts of professional time and money away from other professional business in order to prosecute the action, with no certainty of recovery thereof from any source").

### 3.    The Substantial Risks Presented By This Litigation Fully Support The 25% Fee Plaintiffs Request

Courts recognize that "the risk of the litigation" is pivotal in assessing the appropriate attorneys' fee for class counsel. *See, e.g., Masters*, 473 F.3d at 436; *Wal-Mart*, 396 F.3d at 121. Here, Class Counsel faced significant risk that they would fail to obtain any recovery for the Class and, therefore, that they would receive no compensation for substantial efforts.[26]

As an initial matter, following Congress's adoption of the Private Securities Litigation Reform Act (the "PSLRA") in 1995, dismissals of securities class actions have grown increasingly commonplace. For example, a University of Michigan study published in 2000 concluded that "60 percent of securities class actions were dismissed in 1996 and 1997, compared with 40 percent in 1991 and 1992."[27] Other studies have produced somewhat different statistics, but all have concluded that securities class action counsel face substantial risks of dismissal, and, therefore, non-payment.[28] Moreover, even in cases that produce settlements,

---

[26] In assessing the risks assumed by Class Counsel, the Court should consider the circumstances presented when Plaintiffs commenced this action. *See, e.g., Goldberger,* 209 F.3d at 55 ("It is well established that litigation risk must be measured as of when the case is filed.").

[27] Michael R. Davisson, "D&O Liability Update: Trends for D&O Insurers," 10 No. 32 *Andrews Coverage Litig. Rep.* 679 (Aug. 11, 2000).

[28] *See* Elaine Buckberg, et al., "Recent Trends in Shareholder Class Action Litigation: Are Worldcom and Enron the New Standard," 1505 *PLI/Corp* 405, 413 (2005) ("Dismissal rates nearly doubled after the PSLRA…Of cases filed between 1996 and 2002, dismissals accounted for 39.3% of dispositions…"); Joseph Grundfest & A.C. Pritchard, "Statutes with Multiple Personality Disorders: The Value of Ambiguity in Statutory Design and Interpretation," 54 *Stan. L. Rev.* 627, 692 (2002) (65.9% of motions to dismiss were granted in some form, including 18% of cases dismissed with prejudice); David Levin & Adam Pritchard, "The Securities Uniform Standard Act of 1998: The Sun Sets on California's Blue Sky Laws," 54 *Bus. Law.* 1, 39-41 (1998) (60% of motions to dismiss filed after the PSLRA were granted in some form); Thomas E. Willging, et al., "An Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules," at 69 (Federal Judicial Center 1996) ("Rulings in which all or part of the complaint was dismissed amounted to 47%, 49%, 76%, and 77% of the rulings in E.D. Pa., S.D. Fla., N.D. Ill., and N.D. Cal., respectively…").

class counsel may receive far less than their hourly rates as compensation.[29]  Thus, even in

"typical" securities class actions, class counsel face substantial risk of non-payment.

Furthermore, by no means was dismissal at the pleading stage the sole risk Class Counsel

faced when they commenced this action.  Indeed, courts frequently dispose of securities claims

as a matter of law after the pleading stage, and of course, plaintiffs often lose cases at trial.[30]

Because of the scale of securities class actions, those adverse results can be devastating to

a law firm, which typically devotes millions of dollars in attorneys' fees and millions more in

litigation expenses to prepare cases for trial.  Such losses can threaten the very survival of the

law firm.  The Second Circuit's recent decision in *In re Initial Public Offering Sec. Litig.*, 471

F.3d 24 (2d Cir. 2006) ("*IPO*"), presents an excellent example of the massive risks counsel face

in prosecuting securities fraud class actions.  *IPO* was perceived by the plaintiffs' bar as a

particularly promising case.  As a result, numerous plaintiffs' firms competed to serve as lead

counsel and devoted tens of millions of dollars in legal fees and millions more in expenses

---

[29]  *See In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing district court's fee award because it failed to recognize, among other things, that class counsel face considerable risk of underpayment).

[30]  *See Dura*, 544 U.S. at 346 (reversing a Ninth Circuit decision that plaintiffs had adequately alleged loss causation and dismissing plaintiffs' claims); *Freedman v. Value Health, Inc.,* 34 Fed. Appx. 408, 409 (2d Cir. May 1, 2002) (affirming district court's grant of summary judgment in favor of defendants); *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997) (verdict of $81 million for plaintiffs against an accounting firm reversed on loss causation grounds and judgment entered for defendant); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (affirming grant of summary judgment to defendants); *Anixter v. Home-Stake Prod. Co.* 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 509 (9th Cir. 1991) (affirming grant of summary judgment for defendants after almost five years of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (after trial, reversing the district court's denial of JNOV motion and remanding with instruction to dismiss the complaint); *Ward v. Succession of Freeman,* 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994) (directed verdict for defendants after plaintiffs' presentation of case at trial), *aff'd*, 50 F.3d 6 (4th Cir. 1995); *In re Health Mgmt., Inc. Sec. Litig.*, No. 96-CV-889 (ADS) (E.D.N.Y.) (jury verdict for auditor in securities class action case).

towards advancing the class's claims. *See* Joint Decl. at ¶ 93. Yet, despite the fact that the plaintiffs had reached a partial settlement with certain defendants, the Second Circuit's decision barring class certification in *IPO* creates the distinct possibility that the Class Counsel will receive no compensation and no reimbursement for the millions in litigation expenses they advanced. *Id.* News reports indicate that this result will cause at least one of the plaintiffs' principal firms to fold. *See* "Milberg Weiss Wanted $12.5 Billion in IPO Case," *Bloomberg News Service*, December 6, 2006. Few, if any, other areas of the law present the possibility of such a disastrous result for counsel.[31]

Furthermore, most successful securities class actions arise from a restatement or at least present circumstances in which defendants advanced their personal financial interests through insider trading or otherwise while withholding material facts from investors.[32] This case presents

_____

[31] Some courts have ignored the hard data and the countless decisions recognizing the highly risky nature of securities class actions and declared that those cases often do not present enhanced risks to contingency fee counsel. While the risks presented by a particular case must be assessed individually, assertions that securities class action do not typically present high risk profiles ignore indisputable facts. Nearly all of these erroneous factual assertions stem from the pre-PSLRA, off-hand boasts of two prominent plaintiffs' lawyers that the vast majority of the cases they brought prior to the enactment of the statute were successful. *See In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1258 (C.D. Cal. 1997) (noting that the source of an oft-repeated boast by Melvyn Weiss that losses in securities class actions were "few and far between" was a 1988 *New York Times* article and that the source of an equally well-publicized statement by William Lerach that his firm "achieve[d] a significant settlement although not always a big legal fee, in 90% of the cases we file" was an April 1989 *California Lawyer* article). Those statements are of no significance in light of the hard data accumulated since the PSLRA's passage. *See also, e.g.*, Thomas E. Willging, et al., "An Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules," at nn. 108-09 (Federal Judicial Center 1996) (noting that only 2-4% of all civil actions are disposed of by means of motions to dismiss, but that 49-55% of class actions are disposed of favorably to defendants by means of motions to dismiss or for summary judgment).

[32] *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) ("'Unusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter."); Stephen J. Choi and Robert B. Thomson, "Securities Litigation and Its Lawyers: Changes During the First Decade After the PSLRA," 106 *Colum. L. Rev.* 1489,

neither of those factors, as no restatement or insider sales took place. Thus, Class Counsel recognized that they faced the difficult prospect of convincing a jury that the Individual Defendants perpetrated a fraud from which they supposedly derived no financial benefit. *Id.*[33]

In sum, this litigation presented substantial risks, even at the outset, that justify a significant percentage fee for Class Counsel. *See, e.g., Continental Ill.,* 962 F.2d at 568. The "risk of the litigation" factor highlighted in *Masters*, *Wal-Mart*, and numerous other decisions therefore strongly supports the 25% fee Plaintiffs request.[34]

### 4.    The Quality Of Class Counsel's Representation Of The Class Supports The 25% Fee Plaintiffs Request

The fourth factor cited by the Second Circuit for determining class counsel's percentage fee is the "quality of representation" delivered in the litigation. *Masters*, 473 F.3d at 436; *Wal-Mart*, 396 F.3d at 121.

---

1500-01 (2006) ("accounting restatements are significantly related to high value settlements in the post-PSLRA period").

[33] *See, e.g., In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 666 (E.D. Va. 2001) ("For example, plaintiffs' burden of proving that the MicroStrategy Defendants acted with scienter would have been particularly heavy given that the MicroStrategy Defendants would likely have argued that they continually and reasonably relied on the advice of their outside auditor, defendant PwC, with regard to the accounting treatment accorded MicroStrategy's contracts."); *Goldsmith v. Technology Solutions Co.*, 1995 WL 17009594, at *3 (N.D. Ill. Oct. 10, 1995) (citing "the notoriously difficult requirement of proving that defendants acted with the requisite degree of scienter in issuing the alleged misstatements") (citation omitted).

[34] *See, e.g., In re Adelphia Comms. Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *2 n.5 (S.D.N.Y. Nov. 16, 2006) (recognizing that plaintiffs faced substantial risk of non-recovery in class action despite criminal convictions of principal executives and SEC's pursuit of investigation against accounting firm because the "massive fraud at Adelphia . . . is only the first step in bringing claims to a successful conclusion against parties in the positions of the settling [accounting firm and investment banks]"); *American Bank Note,* 127 F. Supp. 2d at 426-27; *Steiner v. Williams,* 2001 WL 604035, at *7 (S.D.N.Y. May 31, 2001) (awarding 30% fee where the theory of recovery was novel and counsel therefore assumed a substantial risk of non-payment); *Sumitomo*, 189 F.R.D. at 282-84.

Class Counsel believe that they provided excellent representation to the Class. First, the written record in this litigation is a testament to the quality of Class Counsel's work product. For example, the pleadings, motions and briefs submitted by Class Counsel all reflect diligent factual and legal research and attention to crafting first-quality work product. Ultimately, those concerted efforts enabled Plaintiffs to advance their claims in a persuasive fashion despite the spirited defense mounted on Defendants' behalf by a well-respected and nationally prominent law firm.[35] In light of the high dismissal rate in securities class actions and the absence of any restatement or insider selling here, even advancing this case beyond the motion to dismiss stage represented a significant victory for the Class. Moreover, the Class's uniformly positive reaction to the Settlement further evidences the excellent result Class Counsel generated. Notices have been mailed to over 5,500 Workstream investors and included a description of the fee that Class Counsel would request. *See* Joint Decl. at ¶¶ 30, 39. To date, only one Class member objected to the fee request stating only: "In general, the only beneficiary in these types of lawsuits is the law firms involved and their lead plaintiffs'." Joint Decl. Ex. F. Such a statement does not deserve any deference, and the lack of any specific objection to Class Counsel's fee request

---

[35] The nature of the opposition faced by Class Counsel should be considered in assessing the quality of Class Counsel's performance. *See, e.g., Maley*, 186 F. Supp. 2d at 373 (noting that one factor supporting a 33 1/3% fee award was that the defendants were represented by five law firms, including several nationally prominent firms); *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 488 (S.D.N.Y. 1998) ("The quality of opposing counsel is also significant in considering the quality of services rendered by Class Counsel, as measured by the result achieved."); *In re Medical X-Ray Film Antitrust Litig.*, 1998 WL 661515, at *8 (E.D.N.Y. Aug. 7, 1998) (among factors supporting 33% award of attorneys' fees was that "Class Counsel confronted defense counsel from highly respected law firms that raised several challenges to the merits of this case").

demonstrates the Class's appreciation for counsel's service and the quality of their representation.[36]

### 5.    The Fee Request Is Fair In Relation To The Settlement Amount

The fifth factor for determining the appropriate percentage fee award in class actions is the "requested fee in relation to the settlement," *i.e.,* whether the requested fee represents a fair percentage of the settlement achieved.  *Wal-Mart*, 396 F.3d at 121; *accord, e.g.*, *Masters*, 473 F.3d at 436.  Here, the 25% fee Plaintiffs request for their counsel falls well within the range of fees awarded in this Circuit and others in similar circumstances, and should, therefore, be approved.

For example, in the recent decision in *Taft*, 2007 WL 414493, at *10, Judge Leisure awarded counsel 30% of a $15.175 million settlement reached with a corporate defendant, its parent entity, and a number of individuals before the court ruled upon the defendants' motions to dismiss.  *Id.* at *1, 11.  In awarding that fee, the court emphasized the substantial complexity of securities class actions, the significant risks of non-recovery the plaintiffs faced, the high qualify of Class Counsel's representation, and the fact that "[a] fee of thirty percent of the settlement fund is consistent with fees awarded in similar class action settlements resulting in settlements of comparable value."  *Id.* at *10.

---

[36] *See, e.g., Taft*, 2007 WL 414493, at *10 (quality of representation factor weighed in favor of 30% fee where resumes submitted by counsel "demonstrate that the plaintiffs' attorneys have significant experience litigating and settling securities class actions" and counsel "negotiated a settlement on behalf of the class that, in light of the difficulties the plaintiffs faced, is favorable for the plaintiffs"); *In re Prudential Sec. Inc. Ltd. P'ships. Litig.,* 985 F. Supp. 410, 416 (S.D.N.Y. 1997) ("In determining the reasonableness of a requested fee, numerous courts have recognized that 'the lack of objection from members of the class is one of the most important reasons.'") (citation omitted).

Furthermore, by no means is *Taft* an unusual case. Rather, courts within and outside this Circuit have repeatedly awarded counsel fees of 30% or more where they performed no more admirably than have Class Counsel and where the Class Counsel faced no greater, if not significantly lesser, risks than those described above.[37] Moreover, academic research shows that the 25% fee Plaintiffs request for their counsel is ***below*** the norm for comparable settlements.[38] Finally, some courts have perceived a trend towards a "benchmark" fee of 25% for counsel who generate an acceptable result.[39] Again, the fee request here is in line with that "benchmark."

---

[37] *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 299-300, 313 (1st Cir. 1995) (affirming award of a $68 million fee constituting 30.9% of a $220 million settlement arising from hotel fire); *Maley,* 186 F. Supp. 2d at 370 (fee equal to 33 1/3% of a $11.5 million settlement in a case resolved prior to the commencement of any discovery); *In re APAC Teleservices, Inc. Sec. Litig.,* No. 97 Civ. 9145 (S.D.N.Y. Dec. 10, 2001) (awarding fee of 33 1/3% of a $21 million settlement reached prior to the commencement of depositions); *Newman v. Caribiner Int'l, Inc.,* No. 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001) (awarding a fee of 33 1/3% of a $15 million settlement reached prior to the commencement of depositions); *In re Safety Components Inc. Sec. Litig.,* 166 F. Supp. 2d 72, 109 (D.N.J. Sept. 27, 2001) (33 1/3% fee); *Steiner,* 2001 WL 604035, at *7 (30% of $20,000,000 settlement); *In re Blech Sec. Litig.,* 2002 WL 31720381, at *1-2 (S.D.N.Y. Dec. 4, 2002) (33 1/3% of a settlement in excess of $25,000,000); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 2002 WL 1315603, at *2 (S.D.N.Y. June 17, 2002) (30% of total settlement of $3,000,000); *Kurzweil v. Philip Morris Cos., Inc.,* 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% fee in $123 million settlement); *Blech,* 2000 WL 661680, at *5 ("Plaintiffs' request for fees of 30% is reasonable and fair."); *Adair v. Bristol Tech. Sys. Inc.,* 1999 WL 1037878, at *1 (S.D.N.Y. 1999) (33% fee); *Klein,* 1999 WL 38179, at *4 (slightly over 33% fee); *Medical X-Ray,* 1998 WL 661515, at *7 (33.33% fee); *Maywalt v. Parker & Parsley Petroleum Co.,* 963 F. Supp. 310, 313 (S.D.N.Y. 1997) (award of 33.4% "falls within the normal range of fee awards in similar complex cases").

[38] *See* Todd S. Foster, et al., "Trends in Securities Litigation and the Impact of the PSLRA," Figure 12 (NERA 1999) (average fee award in 733 settled securities class actions from 1991-1999 was 30%); Denise N. Martin, et al., "Recent Trends IV: What Explains Filings and Settlements in Shareholder and Class Actions?," at 12-13 (NERA 1996) ("Regardless of case size, fees average 32% of the settlement."); Thomas E. Willging, et al., "An Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules," at 69 (Federal Judicial Center 1996) (median attorneys' fee in the subject districts ranged from 27% to 30%).

[39] *See Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir. 1993); *Camden I Condominium Ass'n Inc. v. Dunkle,* 946 F.2d 768, 774-75 (11th Cir. 1991) ("The majority of

### 6.    Public Policy Considerations Fully
### Support The 25% Fee Request

The sixth factor involves "considerations of public policy" in determining appropriate fees for class counsel. *See Masters*, 473 F.3d at 436. That factor strongly supports the fee Plaintiffs request because courts have consistently recognized that private enforcement of the securities laws is a necessary supplement to government intervention because neither the SEC nor the Justice Department can address all forms of securities fraud.[40]

Here, it was only through Class Counsel's efforts that the Class received some redress for the serious misconduct Plaintiffs allege because, to date, neither the SEC nor any other government agency has pursued any relief for Workstream investors. *See id.* at ¶ 99. The courts' concern for rewarding counsel who prosecute securities class actions that serve the public interest therefore fully supports the 25% fee Plaintiffs request.[41] This is especially true where sophisticated clients – such as Lead Plaintiff here – negotiate a fee agreement in advance of retaining class counsel. As a matter of public policy, such negotiated fee agreements should be upheld.

---

common fund fee awards fall between 20% to 30% of the fund" and "district courts are beginning to view the median of this 20% to 30% range, i.e. 25%, as a 'bench mark.'").

[40]   *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (lawsuits brought by investors "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action'") (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

[41]   *Taft*, 2007 WL 414493, at *11 (emphasizing that public policy factors related to the enforcement of the federal securities laws and deterring violations of those statutes supported the 30% fee awarded to counsel); *Hicks*, 2005 WL 2757792, at *9 (among factors supporting fee award of 30% of $10 million settlement was the fact that "[p]rivate actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices"); *Maley*, 186 F. Supp. 2d at 374 (awarding fee equal to 33 1/3% of an $11.5 million settlement and emphasizing that it is "imperative that the filing of such contingent lawsuits not be chilled by the imposition of fee awards which fail to adequately compensate counsel").

**B.    A Lodestar Cross-Check Confirms The Reasonableness Of The Fee Request**

**1.    Class Counsel Have Worked A Reasonable Number Of Hours In Connection With This Litigation**

As noted above, the Second Circuit has encouraged District Courts to perform a lodestar "'cross-check' on the reasonableness of the requested percentage.'" *Masters*, 473 F.3d at 436 (quoting *Goldberger*, 209 F.3d at 50). Where the lodestar analysis is used as a mere cross-check, the hours documented by counsel need not be "exhaustively scrutinized" by the District Court. *See Taft*, 2007 WL 414493, at *9.

The starting point of a lodestar analysis is determining counsel's lodestar by "multipl[ying] hours reasonably expended against a reasonable hourly rate." *Wal-Mart*, 396 F.3d at 121. The total number of hours billed by Class Counsel is: 2,310.20. While every case is unique, the amount of time Class Counsel have billed is not only appropriate given the amount of work performed in this case, but is also reasonable when compared to the hours deemed appropriate by courts in other class actions. For example**,** in *American Bank Note,* 127 F. Supp. 2d at 423, 432, counsel spent 9,500 hours litigating an action although they had received only "several thousand pages of documents" and conducted no depositions.

**2.    Class Counsel's Billing Rates Are Reasonable**

The second step in the lodestar cross-check analysis is to test the reasonableness of the current billing rates charged by Class Counsel.[42] The governing standard is the prevailing rate for the relevant type of legal work in the community where the services were performed.[43]

---

[42] Courts have consistently endorsed the use of current rates to calculate lodestar figures to compensate counsel for the delay in payment inherent in class actions and for inflation. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 283-84 (1989); *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir. 1998).

[43] *See, e.g., Luciano v. Olsten Corp.,* 109 F.3d 111, 115-16 (2d Cir. 1997) ("[t]he lodestar figure should be in line with those [rates] 'prevailing in the community for similar services by lawyers

Perhaps the best indicators of the "market rates" in New York for Class Counsel in securities class actions are the rates charged by New York firms that *defend* class actions on a regular basis. Those rates run has high as $800 per hour for comparable experience. The rates charged by Class Counsel here (between $400 and $625) are thus well in line and appropriate for New York. Moreover, courts in this District and around the country have repeatedly deemed reasonable hourly rates charged by Class Counsel.[44] Thus, a market check and substantial precedent demonstrate that Class Counsel rates are entirely reasonable.

### 3.     The Multiplier Implied By Plaintiffs' Fee Request Is Also Reasonable

As noted above, where a lodestar analysis is employed to calculate attorneys' fees or is used as a "cross check" on a percentage of recovery analysis, counsel may be entitled to a "multiplier" of their lodestar rate to compensate them for the risk they assumed, the quality of their work, and the result achieved for the class. *See Wal-Mart*, 396 F.3d at 121; *Taft*, 2007 WL 414493, at *11.

---

of reasonably comparable skill, experience and reputation'") (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)); *NASDAQ*, 187 F.R.D. at 489 (appropriate rate in performing lodestar analysis is "the rate 'normally charged for similar work by attorneys of like skill in the area,' taking into account factors such as the experience of the attorney performing the work and the type of work performed") (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977)).

[44] *See, e.g., In re Stock Exchanges Options Trading Antitrust Litig.*, 2006 WL 3498590, at *10 (S.D.N.Y. Dec. 4, 2006) (finding blended average rate of $424 per hour reasonable); *Bianco v. Erkins,* 284 B.R. 349, 352 (S.D.N.Y. 2002) (finding, in 2002, that rates of $535 to $595 per hour for partners were reasonable); *In re Independent Energy Holdings PLC*, 2003 WL 22244676, at *9 (S.D.N.Y. Sep. 29, 2003) (rates of $650/hour for a partner, and $300-$425/hour for associates, are "not extraordinary for a top-flight New York City law firm"); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 310-11 (E.D. Pa. 2003) (using a blended hourly rate of $425 per hour to calculate the lodestar of Class Counsel where the plaintiffs were represented by a large Philadelphia firm and four solo practitioners); *In re BankAmerica Corp. Sec. Litig*., 228 F. Supp. 2d 1061, 1065 (E.D. Mo. 2002) ("Similarly, while the hourly rates ranging up to $695 are high for the Eastern District of Missouri, they are nonetheless within the range of reasonableness in the realm of nationwide securities class actions.").

Here, utilizing the number of hours billed (2,310.20) and the hourly billing rates set forth in the Joint Declaration, Class Counsel's total lodestar is $1,073,114.00.  *See* Joint Decl. at ¶ 81. Thus, the multiple requested by Plaintiffs for their counsel (assuming a 25% fee) is 0.908.  *See* Joint Decl. at ¶ 99.  This is a "negative multiple."

As the Second Circuit has emphasized, courts should assess the reasonableness of lodestar multipliers by considering the same factors analyzed to compute a suitable percentage fee.  *See Wal-Mart*, 396 F.3d at 121; *Taft*, 2007 WL 414493, at *11.  The extensive analysis set forth above demonstrates that Class Counsel have produced an excellent result for the Class in a case fraught with risk.  In cases presenting similar risk profiles, courts in this Circuit have repeatedly awarded Class Counsel multipliers that equaled or exceeded the multiplier Plaintiffs request here.[45]  Thus, the "cross check" lodestar analysis contemplated by the Second Circuit fully supports the reasonableness of the 25% fee Plaintiffs request.

---

[45] *See, e.g., Wal-Mart*, 396 F.3d at 123 ("Here, the lodestar yields a multiplier of 3.5, which has been deemed reasonable under analogous circumstances."); *Taft*, 2007 WL 414493, at *11 (awarding fee of 30% of settlement and noting that the lodestar multiplier of 1.44 "is modest in relation to lodestar multipliers frequently used in this district"); *Adelphia*, 2006 WL 3378705, at *2-3 (award of 21.4% of settlement fund in excess of $450 million, producing a multiplier of 2.89, was justified despite existence of criminal convictions of principal management and SEC investigation of accounting firm and others because "[l]arger lodestar multipliers have been awarded in (more or less) comparable cases"); *Hicks*, 2005 WL 2757792, at *10 (fee equal to 30% of $10 million settlement, producing 1.85 multiplier, was fair because there are "numerous examples of Southern District decisions where multipliers in excess of 1.85 were approved under comparable circumstances"); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) ("during 2001-2003, the average multiplier approved in common fund class actions was 4.35 and during [the] 30 year period from 1973-2003, [the] average multiplier approved in common fund class actions was 3.89") (citing Stuart J. Logan, et al., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Reports 167 (2003)); *In re Lloyd's American Trust Fund Litig.*, 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26, 2002) (awarding a 28% fee, and concluding that "the resulting multiple of 2.09 is at the lower end of the range of multipliers awarded by courts within the Second Circuit"); *Maley*, 186 F. Supp. at 368-69 (33 1/3% fee producing a multiplier of 4.65 was "well within the range awarded by courts in this Circuit and throughout the country"); *NASDAQ*, 187 F.R.D. at 489 (awarding 3.97 multiple in antitrust litigation involving $143 million fee); *Kurzweil*, 1999 WL 1076105, at *2-3 (awarding

IV.    **CLASS COUNSEL ARE ENTITLED TO THE REIMBURSEMENT OF THE EXPENSES THEY ADVANCED ON THE CLASS'S BEHALF**

Counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class. *See Teachers' Retirement System of Louisiana v. A.C.L.N.,* 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004); *American Bank Note,* 127 F. Supp. 2d at 430. Particular costs are compensable if they are of a type normally billed by attorneys to paying clients. *See Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir. 1994); *Mitland Raleigh-Durham v. Myers,* 840 F. Supp. 235, 239 (S.D.N.Y. 1993). Moreover, courts have reimbursed such expenses so long as counsel's documentation of them is "adequate." *Nasdaq,* 187 F.R.D. at 489.

Class Counsel have explained and documented the $38,882.48 in expenses that they incurred. *See* Joint Decl. at ¶¶ 105-107. All of those categories of expenses are typically billed by law firms to their clients.[46] Moreover, the expenses for which Class Counsel seek reimbursement are far less than the maximum expenses of $100,000 referenced in the Notice. *See* Joint Decl. at ¶ 30. Class Counsel are therefore entitled to the reimbursement of those expenses.[47]

---

30% fee and 2.46 multiplier in action largely dependent upon work of government entities in unrelated action against tobacco companies); *Sumitomo,* 74 F. Supp. 2d at 399 (awarding 2.5 multiplier in complex commodities fraud litigation producing $134.6 million dollar settlement for class and noting that, "'[i]n recent years multipliers of between 3 and 4.5 have been common' in federal securities cases") (citation omitted).

[46] *See, e.g., LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998); *Continental*, 962 F.2d at 570.

[47] *See, e.g., Hicks*, 2005 WL 2757792, at *10 (approving expense award of over $727,000 where "[t]he expenses incurred by Co-Lead Counsel include such expenses as expert witness fees, claims administrator fees, and other expenses necessary to the litigation and settlement of this action"); *Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys. For this reason, they are properly chargeable to the Settlement fund.").

## V.    PLAINTIFFS SHOULD BE GRANTED AN INCENTIVE AWARD

Under the Private Securities Litigation Reform Act of 1995, the Court has the discretion to grant an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).  Courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *In re Gilat Satellite Networks, Ltd. Sec. Litig.*, No. CV-02-1510, 2007 WL 2743675, at *19 (E.D.N.Y. Sept. 18, 2007) (awarding plaintiffs $300 per hour for their time spent managing the case).  In addition, "[i]ncentive awards are not uncommon in class action litigation ... particularly where ... a common fund has been created for the benefit of the entire class." *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 498 (E.D. Pa. 2003) (citation and internal quotes omitted) (alterations in original).  Indeed, "[t]hese awards are generally in keeping with the public policy concerns cited in class actions." *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *4 (C.D. Cal. June 10, 2005).

Plaintiffs request a total of $50,000 – $40,000 for SQA and $10,000 for Barany – as incentive awards for bringing, prosecuting and serving as class representatives in this Action. The Notice informed Class members that Plaintiffs would seek such reimbursement, and the sole objection was the lack of information regarding the justification for the payments.  As the Joint Declaration and the separate declarations for each Plaintiff states, the efforts provided by the

Plaintiffs fully support the award requested.    Ample other authority supports the incentive

awards requested here.[48]

---

[48] *See  Brotherton v. Cleveland,* 141 F. Supp. 2d 907, 913 (D. Ohio 2001) (awarding $50,000
incentive award to class representative); *Enterprise Energy Corp.,* 137 F.R.D. at, 250-51
(awarding $50,000 to each class representative); *In re Dun & Bradstreet Credit Servs. Customer
Litig.,* 130 F.R.D. 366, 373-74 (S.D. Ohio 1 990) (awarding two class representatives $ 55,000
each and three class representatives $ 35,000 each); *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th
Cir. 1998) (approving $25,000 class representative award); *Berger v. Xerox Corp. Ret. Income
Guar. Plan,* No. 00-584, 2004 U.S. Dist. LEXIS 1819, at *7 (S.D. Ill. Jan. 22, 2004); (awarding
$20,000 to each named plaintiff); *Dornberger v. Metro. Life Ins. Co.,* 203 F.R.D. 118 (S.D.N.Y.
2001) (reviewing case law supporting awards from $2,500 to $85,000); *In re Cardizem,* 218
F.R.D. at 535 (providing incentive awards to named plaintiffs in amounts between $2,500 and
$75,000 each, and noting that in total the awards amounted to less than .002% of the settlement
fund); *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173 (S.D. Cal. 2007)
($40,000 award to single plaintiff); *In re CV Therapeutics, Inc., Sec. Litig.*, No. C 03-3709, 2007
WL 1033478, at *2 (N.D. Cal. Apr. 4, 2007) ($26,000 award to one plaintiff); *In re Charter
Comm., Inc., Sec. Litig.*, Nos. MDL 1506, 4:02-CV-1186, 2005 WL 4045741, at *25 (E.D. Mo.
June 30, 2005) ($26,625 award to lead plaintiff); *In re Dun & Bradstreet Credit Serv. Cust.
Litig.*, 130 F.R.D. 366, 376 (S.D. Ohio 1990) (awarding two class representatives $55,000.00
each and three class representatives $35,000.000 each); *In re Hamilton Bancorp Sec. Litig.*, No.
01-0156-CIV, slip op. (S.D. Fla. Mar. 21, 2005) (awards totaling over $20,000); *In re Xcel
Energy, Inc., Securities, Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn.
2005) ($100,000 award to lead plaintiffs); *In re Quintus Sec. Litig.*, No. C-00-4263, 2006 WL
3507936, at *4 (N.D. Cal. Dec. 5, 2006) ($12,000 award to the lead plaintiff); *New England
Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 635 (W.D. Ky.
2006) (awards totaling $27,500 under § 78u-4(a)(4)); *Enterprise Energy Corp. v. Columbia Gas
Transmission Corp.*, 137 F.R.D. 240, 251 (S.D. Ohio 1991) (granting awards in the amount of
$50,000 for each of the six class representatives); *In re Remeron End-Payor Antitrust Litig.*, Nos.
Civ. 02-2007 FSH, Civ. 04-5126 FSH, 2005 WL 2230314, at *32 (D.N.J. Sept. 13, 2005)
(including two $30,000 awards); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio
2001) ($50,000 award to one class representative); Theodore Eisenberg & Geoffrey P. Miller,
*Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1308
(2006) ("[W]hen an incentive award was granted, the average total award was $128,803 ....").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion to approve the proposed Settlement in its entirety.

Dated: June 17, 2008

Respectfully submitted,

SHALOV STONE BONNER & ROCCO LLP
 /s/ Ralph M. Stone
Ralph M. Stone (rstone@lawssb.com)
Thomas G. Ciarlone (tciarlone@lawssb.com)
Amanda C. Scuder (ascuder@lawssb.com)
485 Seventh Avenue, Suite 1000
New York, NY 10018
(212) 239-4340

SARRAF GENTILE LLP
Ronen Sarraf (ronen@sarrafgentile.com)
Joseph Gentile (joseph@sarrafgentile.com)
11 Hanover Square
New York, NY 10005
(212) 868-3610

*Co-Lead Counsel for Plaintiffs*